**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0356-21

DEAN MARZETTA, KRISTINE
FREISINGER, and BROADWAY
CONTRACTING CO.,
ELECTRICAL CONTRACTORS,
INC.,

      Plaintiffs-Appellants,

v.

STANOY TASSEV, DAVID LEVINE,
DESIREE WEAVER and OCEAN
COAST ELECTRIC, LLC,

      Defendants-Respondents.

_____

Argued October 25, 2023 – Decided December 31, 2024

Before Judges Vernoia, Gummer and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Chancery Division, Middlesex County, Docket No. C-000104-16.

Robert J. Donaher argued the cause for appellants (A.Y. Strauss, attorneys; Robert J. Donaher, of counsel and on the briefs).

Justin J. Walker argued the cause for respondent David Levine (Law Office of Mark Faro, LLC, attorneys; Justin J. Walker, of counsel and on the brief).

Stuart Reiser argued the cause for respondents Stanoy Tassev, Desiree Weaver and Ocean Coast Electric, LLC (Shapiro, Croland, Reiser, Apfel & Di Iorio, LLP, attorneys; Stuart Reiser and Alexander G. Benisatto, on the brief).

The opinion of the court was delivered by

VERNOIA, J.A.D.

In this commercial dispute arising over the sale of an electrical contracting business that the parties agreed to submit to arbitration and was the subject of a twenty-six-day hearing and a one-hundred-and-thirteen-page arbitration award, plaintiffs Dean Marzetta, Kristine Freisinger, and Broadway Contracting Company, Electrical Contractors, Inc. (Broadway) appeal from Chancery Division orders granting the motion of defendants Stanoy Tassev, David Levine, Desiree Weaver, and Ocean Coast Electric, LLC to confirm the arbitration award and denying plaintiffs' cross-motion challenging the court's determination plaintiffs were not entitled to suppression of defendants' defenses and entry of default based on defendants' spoliation of evidence. Finding no merit to plaintiffs' arguments challenging the court's orders, we affirm.

## I.

We begin by noting the arguments supporting plaintiffs' appeal focus on their contention the court erred by rejecting their claim that the arbitrator erroneously denied their motion to suppress defendants' defenses and enter default against defendants as the sanction for the spoliation of electronically stored information on a computer server plaintiffs contend included data—primarily emails—relevant to their case. As part of the arbitration award that included findings and determinations on a multitude of issues, the arbitrator found defendants were responsible for spoliation of the server and recommended a significant sanction—the dismissal of defendants' counterclaims—that the Chancery Division later adopted.

On appeal, plaintiffs argue that the sanction the arbitrator and court imposed for the spoliation of the server was insufficient and therefore erroneous. Thus, for purposes of our analysis of plaintiffs' arguments on appeal, we limit our summary of the facts to those pertinent to a disposition of plaintiffs' claim the arbitrator and the court erred by imposing a spoliation sanction plaintiffs contend is inadequate.

3

The Sale and Subsequent Closure of Broadway

Broadway is a commercial and industrial electrical contractor that Levine established in 1982. In 2012, Levine sold half of the capital stock in Broadway to Tassev. An October 2015 valuation calculated Broadway's worth at $4,835,000.

Marzetta and Freisinger entered into a December 28, 2015 Stock Purchase Agreement (SPA) with Tassev and Levine. The agreement provided for Marzetta's and Freisinger's purchase of all shares of Broadway capital stock for $3,200,000. The SPA required that Marzetta and Freisinger pay $500,000 in cash and provided they would finance part of the purchase price with a $1,900,000 Small Business Administration loan from Flushing Bank secured by a perfected first lien interest in all the company's assets. Marzetta and Freisinger executed two separate $400,000 promissory notes in favor of Tassev and Levine to finance the balance of the purchase price. The SPA provided that the promissory notes were subordinate to the Small Business Administration loan from Flushing Bank. Marzetta and Freisinger also entered into a separate ten-year lease with Levine for the property in Jamesburg at which Broadway was located.

4

Under the SPA, Marzetta's or Freisinger's default on the lease or promissory notes permitted Tassev and Levine to void certain restrictive covenants that otherwise prevented them from revealing trade secrets, operating a competing business within a 200-mile radius for five years after the sale, and hiring Broadway employees or independent contractors for five years following the closing date.

The SPA also granted to Tassev and Levine the right to receive from plaintiffs certain pre-closing accounts receivable that were due Broadway. Section 1.7(ii) of the SPA provided that the pre-closing accounts receivable remained Tassev's and Levine's property and required that any pre-closing accounts receivable paid to plaintiffs following the closing would be deposited into Broadway's operating account, and then first applied to any pre-closing receivables with the balance to be paid to Tassev and Levine.

The SPA further provided that Tassev and Levine "retain[ed] access to and signing authority on all [of Broadway's] operating accounts until such time as all [p]re-[c]losing [r]eceivables are received and [p]re-[c]losing [p]ayables are paid, and any sums due to Sellers are paid (the "Clearance Date")." The SPA cautioned that if Tassev and Levine "are denied access to such account or accounts prior to the Clearance Date, such denial shall constitute an event of

A-0356-21

default under the [p]romissory [n]otes."  The SPA also included a provision describing the manner in which pre-closing accounts receivable would be calculated.

The closing of the stock sale to Marzetta and Freisinger took place on January 27, 2016.  At closing, Tassev provided a pre-closing accounts receivable list that totaled $1,580,000.

Within weeks of the closing, Broadway experienced cash-flow problems that caused Marzetta to terminate employees and take other cost cutting measures.  He claimed the business was "taking on water" and asked Tassev and Levine if they would forgive the two $400,000 promissory notes provided at the closing.  Tassev and Levine denied the request, and Marzetta and Freisinger defaulted on the promissory notes.

Following the closing, Marzetta retained in Broadway's employ Desiree Weaver, Jeremy Wikoff, and Micheal Liscio, who had worked for Broadway prior to the sale.  Wikoff and Liscio were employed as project managers, and Weaver served as Broadway's office manager and bookkeeper.

As noted, under the SPA, following the closing Tassev had ongoing access to, and signing authority, on Broadway's operating account and access to Broadway's accounts computer system.  Following the closing, Tassev provided

plaintiffs with spreadsheets that tracked Broadway's receipt of pre-closing accounts receivable payments and the transfer of those funds to a Broadway account Marzetta had established as the "repository of the accounts receivable payments" due Tassev and Levine under the SPA.

Apart from the obligations under the SPA, Tassev separately provided Marzetta with web hosting and information technology services, which included maintenance of email accounts for Broadway employees and access to the "ERP" software application Tassev had implemented during his ownership of Broadway to track proposals, projects, labor, materials, and invoices. Marzetta paid Tassev $700 per month for the information technology services that Marzetta understood were provided by an entity known as "13BIK," which was located in Bulgaria and whose president was Tassev and vice-president was Tassev's brother, Iani Tassev (Iani). As part of that arrangement, Iani "provided and serviced" Broadway's email system through 13BIK.

During the months following the closing, Marzetta suspected that Tassev controlled Liscio, Wikoff, and Weaver and that Liscio and Weaver were underperforming their job duties for the purpose of undermining Broadway's business. By April 28, 2016, a little over three months after he and Freisinger had purchased Broadway, Marzetta determined the company could not continue

7

to operate due to cash flow issues and closed the company. Before doing so, he withdrew $208,000 from Broadway's operating account, claiming the monies were "personal funds" that he and Freisinger had deposited into the account.

Marzetta and Freisinger defaulted on their obligations to Flushing Bank, which later obtained a $2,110,446.50 judgment against them.

In May 2016, Tassev, Levine, Weaver, and other former Broadway employees resurrected Broadway's business under the moniker, Broadway Power, and later as Ocean Coast Electric, LLC, which was owned by Tassev and Rocco Reffie. Ocean Coast had been established by Reffie in 2012 and, following Broadway's closure in April 2016, Tassev purchased half of Ocean Coast from Reffie. Ocean Coast operated out of Broadway's old location, and Tassev and Levine deposited cash into Ocean Coast's accounts for payroll and materials. The funds were also used to pay Flushing Bank $85,000 for Ocean Coast's purchase of Broadway's assets, which the bank had seized following Marzetta's and Freisinger's default on the Small Business Administration loan. Ocean Coast then sought to complete Broadway's outstanding projects and sought new business.

Ocean Coast later paid Levine for his investment in the company, and he had no further involvement with it. Between May and December 2016, Ocean

A-0356-21

Coast had $1,600,000 in gross revenue, and, in 2017, Ocean Coast's revenue exceeded $4,500,000.

Plaintiffs' Lawsuit And Claims Arising From Their Purchase Of Broadway

In June 2016, Marzetta and Freisinger filed a seven-count complaint in the Chancery Division against Tassev, Levine, Weaver, Wikoff, and Liscio. The complaint alleged that immediately after Marzetta and Freisinger had acquired Broadway from Tassev and Levine, defendants "conspired to loot and destroy the business" through an alleged fraudulent scheme so that Tassev and Levine could reclaim ownership of Broadway from plaintiffs.[1]

By March 2017, plaintiffs had amended the complaint for a second time, adding Broadway as a plaintiff, Ocean Coast as a defendant, and dismissing the complaint as to Wikoff and Liscio. The ten-count amended complaint alleged that plaintiffs' abrupt closure of Broadway was due to a fraudulent scheme committed by defendants and that Ocean Coast, owned by Tassev and Reffie (who was never named as a party), was "the corporate instrumentality through

---

[1]  The complaint included causes of action for rescission, fraud, interference with economic advantage, breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and civil conspiracy.

A-0356-21

which the [d]efendants' fraudulent scheme was successfully effectuated."[2] Based on those claims, plaintiffs sought rescission of the SPA and the promissory notes, return of the monies paid under the SPA, restitution, disgorgement, compensatory and punitive damages, and attorney's fees.

Defendants filed answers and counterclaims seeking almost $1,500,000 for unpaid rent and other fees, and monies due on the promissory notes executed by plaintiffs, pre-closing accounts receivable owed to defendants pursuant to the SPA, and costs paid by defendants for plaintiffs' computer forensic expert.

Plaintiffs' Initial Application For A Spoliation-Of-Evidence Sanction

In a May 30, 2018 order, the Chancery Division appointed a retired Superior Court judge as a Special Discovery Master pursuant to Rules 4:41-1 to -5. In February 2019, plaintiffs filed a motion with the retired judge alleging that defendants had "intentionally spoliated" certain electronically stored information (ESI). More particularly, plaintiffs alleged defendants had spoliated two separate sets of ESI: (1) data on defendants' virtual Microsoft

---

[2] The second amended complaint included causes for rescission, fraud, interference with economic advantage, conversion, breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with contract, unjust enrichment, and civil conspiracy. The second amended complaint also asserted a breach-of-fiduciary-duty-and-duty-of-loyalty cause of action solely against Weaver.

Exchange Server, which had stored emails plaintiffs claimed were relevant to issues in the litigation; and (2) data pertaining to defendants' communications on Slack, a cloud-based instant messaging application. In their motion, plaintiffs sought, among other relief, the suppression of defendants' defenses to the causes of action in the second-amended complaint and entry of default against defendants.

After considering the parties' arguments on the motion, the retired judge recommended that the court: (1) deny plaintiffs' motion without prejudice; (2) compel defendants "to produce the entire Exchange Server to plaintiffs' forensic computer expert for forensic imaging"; (3) permit plaintiffs to renew their spoliation motion regarding the Exchange Server if the forensic examination "reveals that any ESI has been improperly withheld, altered, deleted or destroyed"; (4) authorize plaintiffs to obtain data from Slack; and (5) allow plaintiffs to renew their spoliation motion regarding the Slack data if Slack confirmed that data "has been destroyed."

On May 2, 2019, the Chancery Division adopted the retired judge's recommendations and entered an order directing that defendants allow representatives of plaintiffs' computer forensics expert's firm, Business Intelligence Associates (BIA), access to the Microsoft Exchange Server for

11

purposes of forensic imaging and providing that if plaintiffs' expert determined ESI had been withheld or deleted, then plaintiffs could renew their spoliation motion.

The Parties' Agreement to Arbitrate Plaintiffs' Claims

On May 21, 2019, the parties agreed to submit their dispute arising from plaintiffs' claims to binding arbitration pursuant to the New Jersey Arbitration Act (NJAA), N.J.S.A. 2A:23B-1 to -36. The parties agreed the retired judge, who had been serving as the Special Discovery Master, would thereafter serve as the arbitrator. The arbitration agreement plainly states, "The decision of the Arbitrator in the Arbitration shall be final and binding. No party shall have the right to appeal the Arbitrator's decision."

The arbitration agreement, however, included an exception to the prohibition against the filing of an appeal from the arbitrator's decision. The agreement permitted an appeal to the Chancery Division from any decision by the newly designated arbitrator on any renewed spoliation-sanction motion that might be filed by plaintiffs. More particularly, the arbitration agreement provided that if plaintiffs renewed their spoliation-sanction motion, the parties agreed "there shall be no waiver of the right to object to" the arbitrator's "decision on that motion," and each party "maintains the right to appeal . . . to

A-0356-21

the Chancery Action Judge pursuant to the procedures set forth" in the Chancery Division's May 30, 2018 order that had previously appointed the arbitrator as the Special Discovery Master.

On June 7, 2019, following their entry into the arbitration agreement, the parties executed a Stipulation and Order of Dismissal Without Prejudice of the Chancery Division action. The order dismissing the action included an exception pertinent here; it provided that "[t]he [c]ourt shall retain jurisdiction over this action for the purpose of (1) an appeal by one or more of the parties with respect to Plaintiffs' Motion for the Suppression of the Defense and the Entry of Default for Intentional Spoliation . . . ."

Plaintiffs Renew Their Spoliation-Sanction Motion In The Arbitration

On September 12, 2019, plaintiffs renewed their spoliation-sanction motion but only as to the alleged spoliation of the Slack ESI. The retired judge, then serving as the arbitrator, granted the motion in part and denied it in part without prejudice. The arbitrator found defendants had engaged in spoliation with respect to the Slack channels, which had "contained approximately 568,000 messages potentially relevant to this lawsuit," and entered an adverse spoliation inference in plaintiffs' favor to support plaintiffs' fraud claim. The arbitrator denied, without prejudice, plaintiffs' requests to suppress defendants' defenses

13

and for attorney fees, sanctions and costs, pending the outcome of the anticipated renewed spoliation motion regarding data on the Microsoft Exchange Server.

Several months later, plaintiffs renewed their spoliation-sanction motion as to the ESI from the Microsoft Exchange Server. On March 31, 2020, the arbitrator entered Special Discovery Master Order Number 15 in which he reserved decision on the renewed spoliation motion "pending testimony by the parties' respective computer forensic experts" during the arbitration hearing, explaining he would issue "an ultimate ruling . . . at the conclusion of the arbitration as part of the final decision and [a]ward."

In paragraph (E) of the order, the arbitrator also addressed the parties' preservation of appellate rights to challenge his disposition of the renewed spoliation motion. The order states:

> The Parties' respective appellate rights preserved in the arbitration agreement with respect to the relief sought in connection with the Spoliation Renewal Motion only, and as reflected in prior orders . . . , shall survive the arbitration proceeding and shall be available to the Parties as of right from the Special Discovery Master's final decision and Award.[3]

---

[3] Although by that time the arbitrator no longer served as a Special Discovery Master, because the lawsuit in which he had been designated as such had been dismissed by the parties in favor of their arbitration agreement, the arbitrator referred to himself as the Special Discovery Master in the order.

The Arbitration Hearing and Award

During the twenty-six-day arbitration hearing, fourteen witnesses testified, including Marzetta, Freisinger, Levine, Weaver, Tassev, former Broadway employees, two forensic accountants, and two computer forensic experts. The arbitrator also considered deposition testimony from unavailable witnesses, including Tassev's brother, Iani, as well as other documentary evidence.

Plaintiffs' claims concerning what they alleged were defendants' wrongful diversion of pre-closing accounts receivable monies were the primary focus of the proceedings. Two forensic accountants testified regarding the pre-closing accounts receivables and plaintiffs' claims that Tassev and Levine, with Weaver's assistance, had improperly diverted more money away from Broadway than to which they were entitled under the SPA and had thereby created the cash-flow problems that had caused plaintiffs to shutter the business.

Plaintiffs' forensic accountant, John J. O'Donnell, opined to a reasonable degree of accounting certainty that: (1) because Tassev had diverted $426,376 more than he and Levine were entitled to under the SPA from Broadway's operating account, Tassev proximately caused Broadway's shutdown by creating a dire cash flow shortage; and (2) plaintiffs sustained $4,800,000 in damages as

15

a result.  Theresa M. Simonds, the forensic accountant retained by Tassev, Weaver, and Ocean Coast, testified Tassev had obtained approximately $32,000 less from Broadway than the amount to which he and Levine were entitled under the SPA for the pre-closing accounts receivable.  Simonds further opined that plaintiffs' inexperience and failure to supply sufficient working capital had caused Broadway's financial collapse and concluded Tassev and Levine had suffered damages due to plaintiffs' failure to pay the balance due on the promissory notes and for uncollected pre-closing receivables due them under the SPA.

During the hearing, the arbitrator granted in part defendants' motion for judgment in accordance with Rule 4:40-1, dismissing Broadway as a plaintiff and all claims asserted on Broadway's behalf.[4]  The arbitrator also dismissed plaintiffs' causes of action for rescission, all claims for equitable relief, and the breach-of-the-duty-of-good-faith-and-fair-dealing claim against Weaver.  The arbitrator also ordered that plaintiffs' fraud claim "shall be limited to" the allegation that "Tassev and Levine falsely identified the pre-closing accounts

---

[4]    Rule 4:40-1 allows in court proceedings a motion for judgment "at the close of all evidence or at the close of the evidence offered by an opponent."  Although the Rule is not applicable in an arbitration proceeding, defendants sought the dismissal of plaintiffs' claims in the arbitration under the principles attendant to the Rule.

receivable and accounts payable on the January 27, 2016 list that was appended to the" SPA.

Evidence relevant to plaintiffs' spoliation claims and motions was also presented during the arbitration hearing. Plaintiffs claimed defendants spoliated evidence—ESI—on a Microsoft Exchange Server, designated as 44 KM-Exchange 1. It is undisputed that in November 2016, Tassev transferred to a third party the equipment on which the server had run as part of his sale of another of his businesses. As a result, he failed to produce the 44 KM-Exchange 1 server during discovery and instead later produced what he claimed was one of two duplicates of, or back-ups to, the server. More specifically, he produced a server that was identified as the "44 KM-Exchange 3" server.

Defendants had not produced the 44 KM-Exchange 3 server initially, and its existence was revealed to plaintiffs during a deposition of Tassev's then-estranged brother, Iani. Iani claimed Tassev had asked him to take possession of the server so that Tassev could "say that he never had possession [of it]." When later accused of failing to produce it, Tassev claimed the 44 KM-Exchange 3 server was a duplicate of the 44 KM-Exchange 1 server that belonged to Iani and that they had never been in his, Tassev's, possession. Tassev also claimed that only Iani had the server's usernames and passwords.

A-0356-21

Tassev, however, also admitted that following a dispute with Iani, he terminated Iani's employment with another company he owned, and he had the 44 KM-Exchange 3 server and other computer equipment "shut down, removed, and transported to a warehouse in College Point, NY" where it had remained until the forensic examination in this litigation. Tassev testified he had asked Iani to export to him all the emails from the 44 KM-Exchange 3 server, and that had allowed him, through his counsel, to produce during discovery in September 2017 more than 130,000 emails from Broadway's employees from between April 2014 to October 2016. Iani claimed Tassev had instructed him to selectively export the emails to a personal computer where Tassev could then review them before producing them in the litigation.

Although Iani's initial affidavit and deposition testimony regarding the existence of the 44 KM-Exchange 3 server was corroborated by Tassev, Iani later recanted much of his initial affidavit and deposition testimony during which he had sided with plaintiffs and supported their fraud and civil conspiracy claims against Tassev. Iani later claimed that he had recanted only because Tassev had threatened him and his family and conspired to deprive him of access to his children. The record further shows Iani has a criminal record that the arbitrator considered in part in assessing Iani's credibility.

A-0356-21

Plaintiffs and defendants Tassev, Ocean Coast, and Weaver retained computer forensic experts who testified at the arbitration hearing. Plaintiffs' expert, Wesley Johnson, is a Senior Digital Forensic Examiner at BIA. Johnson and his supervisor, Adam Feinberg, conducted a forensic examination of the 44 KM-Exchange 3 server to determine whether it was truly a "hot" back-up to the missing 44 KM-Exchange 1 server and whether it was the server from which defendants had produced emails and other ESI during discovery. BIA's findings and conclusions are detailed in a report dated February 21, 2020, and Johnson testified during the arbitration hearing.

BIA concluded that the 44 KM-Exchange 3 server was not a direct back-up for the original server and thus was "not a reliable copy of" it. BIA had learned that another server, identified as the 44 KM-Exchange 2 server, which was also missing, had been created simultaneously with the 44 KM-Exchange 1 server on March 19, 2014, and had interacted directly with the original server. BIA explained that "when a new Exchange Server is set up for the first time, an additional server is set up as a backup server for redundancy purposes" to prevent data loss. Thus, because they were created on the same day, BIA concluded the 44 KM-Exchange 2 server—not the 44 KM-Exchange 3 server

A-0356-21

that Tassev produced—was the direct back-up to the missing 44 KM-Exchange 1 server.

BIA opined that the 44 KM-Exchange 3 server was a redundant back-up to both the 44 KM-Exchange 1 and 44 KM-Exchange 2 servers, and concluded the 44 KM-Exchange 3 server, which was not created until October 3, 2014, and was disconnected on October 21, 2016, was unreliable because its entire database "was recreated on May 27, 2016 . . . a month after . . . [d]efendants' litigation-hold obligations arose [on April 28, 2016], causing the entire pre-existing database on the server to be overwritten and thereby deleted."  More specifically, BIA opined that "the data from October 3, 2014, to May 27, 2016, was either deleted or written over and in either event unavailable for review."

BIA further concluded the 44 KM-Exchange 3 server's data was otherwise compromised and unreliable because it had been "corrupted" shortly after being created, and the data on the server showed replication errors that caused concern over the data's accuracy and completeness.  BIA concluded it was impossible to determine "the extent to which discoverable documents . . . were deleted, destroyed or withheld from production . . . without examining" the 44 KM-Exchange 1 server or the 44 KM-Exchange 2 server.

A-0356-21

During cross-examination, Johnson confirmed that he did not look at any individual emails stored on the 44 KM-Exchange 3 server, which contained 238 gigabytes of data (and approximately 1.4 million email messages from five different Tassev businesses), as part of his forensic analysis. He asserted that the content of the emails was not relevant to his forensic analysis and admitted that Microsoft does not consider either the block replication or mailbox space errors to be "critical errors" that would require immediate attention.

Defendants Tassev, Weaver, and Ocean Coast relied on Jeffrey Brenner, managing principal of Maragell, LLC, as their computer forensics expert. In a March 9, 2020 certification, Brenner responded to the BIA report. Brenner, who offered his opinions to a reasonable degree of scientific certainty, agreed with Johnson that the 44 KM-Exchange 1 server was the primary server and that, although the 44 KM-Exchange 2 and KM-Exchange 3 servers were configured as backups, when configured in the manner in which the servers had been, "the data on all three servers will be identical."

Regarding the multitude of error messages in the system logs for the 44 KM-Exchange 3 server, Brenner disagreed with Johnson's testimony that those messages signified the server was "corrupt and unreliable." Brenner explained the error codes were "informational" and "simplif[y] the research into the cause

A-0356-21

of any issues and how to fix or resolve the identified issues." Brenner explained that the only "critical" error codes occurred on July 24, 2016, when the server "appears to have not been powered down cleanly." He also noted that certain event codes indicated that the server was "generally healthy."

As for specific emails contained on the server, Brenner found "hundreds" of emails from Tassev, Levine, Weaver, and others that pre-dated the May 27, 2016 re-creation of the database and opined that this established the re-creation did not permanently delete or overwrite older data. He further testified that "1.4 million to 1.8 million" emails, including duplicates, were accessible on the 44 KM-Exchange 3 server and suggested the database re-creation could have been needed as a result of adding hard drives to increase storage space and that "sanitizing" the server would have required a "sophisticated/coordinated effort" not borne out by the evidence.

Brenner concluded "that there is no evidence that emails from [the KM-Exchange 3 server] have, in fact, been spoliated and, notwithstanding the commonly found error codes," there is "no evidence to establish the email data on the Server is unreliable or corrupted." He testified that he was not presented with any emails that should have been on the server that were not present, and he cited deposition testimony from Iani "that he didn't delete anything from [the

22

KM-Exchange 3 server], and he was the only one who could [permanently] delete anything from it."

Brenner also offered an opinion as to Johnson's review and analysis of the servers:

> So Mr. Johnson did a nice job of looking at the outside, looking at the replication errors and connectivity errors, but he never opened the box. He admitted he didn't look at any e-mails. He didn't do much of an investigation to see if something was wrong inside.
>
> And as far as the spoliation is concerned, he didn't bother to look inside to see if anything was missing. He didn't compare anything from outside the box to see if he was missing something.

BIA issued a response to Brenner's certification, stating it stood by its opinion that the high frequency of replication and redundancy errors on the 44 KM-Exchange 3 server rendered it "unhealthy" and rejecting Brenner's opinion that database re-creation could have occurred due to the need for additional storage space.

The Arbitration Decision

In his final opinion and award, the arbitrator recognized that "[t]he parties' respective experts cannot even agree as to whether the Produced Server [44 KM-Exchange 3] was in fact a reliable back-up, let alone whether any ESI was

deleted or destroyed." The arbitrator further found that defendants had produced more than 130,000 emails during the litigation. Of note, although Marzetta initially alleged that emails produced in discovery by defendants had been fabricated or altered, he withdrew that contention during the arbitration and vaguely claimed only that "there's a lot of missing evidence."

In the final arbitration award, the arbitrator found plaintiffs did not prove their causes of action, defendants did not prove one of the causes of action asserted in their counterclaim, and that although defendants had established plaintiffs breached financial obligations owed to Tassev and Levine under the SPA, defendants should not recover any damages from plaintiffs as a sanction for their spoliation of ESI.

The arbitrator first observed that the genesis of Broadway's demise was the numerous problems with a poorly drafted SPA that plaintiffs' counsel had identified in a September 22, 2017 letter to the attorney who had represented plaintiffs during their purchase of the company. The letter noted that plaintiffs' counsel for the transaction had failed to: ensure the SPA provided for adequate net-working capital to sustain the business; advise plaintiffs of the inherent cash-flow issues that were presented by the SPA's terms; require that the sellers identify work in progress at the time of closing; advise plaintiffs about the

24

extraordinary access to Broadway's records and bank accounts to which Tassev and Levine were entitled following the sale under the SPA; advise plaintiffs as to the significance of the SPA's exceptions to the restrictive covenants for Tassev and Levine; and ensure the sale included a conveyance of all of Broadway's assets, including its computer system. The arbitrator also noted that plaintiffs had recovered $600,000 on their negligence claims against the attorney who had represented them during their purchase of Broadway.

In any event, the point of the arbitrator's findings concerning the deficiencies in the SPA was that the contractual arrangement that had been negotiated on plaintiffs' behalf contributed greatly to the circumstances that compelled Broadway's closure in April 2016. The arbitrator also summarized the testimony of the parties' forensic accounting experts and found unpersuasive O'Donnell's testimony that defendants had wrongfully converted to their benefit Broadway's pre-closing accounts receivable. The arbitrator further rejected as untrue Marzetta's claim Tassev had accessed Broadway's accounting system without authorization, noting the SPA expressly provided that Tassev and Levine "will retain access to and signing authority on all operating accounts until such time as all [p]re-[c]losing [r]eceivables are received."

25

Moreover, the arbitrator found that Broadway's business had failed following the January 2016 stock sale because: it lacked adequate working capital; it had inconsistent revenue; Marzetta had failed to account for the fact that customers did not pay invoices for sixty to ninety days; Marzetta withdrew more than $200,000 from Broadway shortly before it closed; and Marzetta and Freisinger had substantial financial obligations to Flushing Bank and under the promissory notes following the sale. That is, the arbitrator concluded plaintiffs had failed to prove their claim that Broadway's closure was the product of any wrongful conduct by defendants.

The arbitrator also concluded that plaintiffs' evidence was insufficient to support their claims against defendants even with the benefit of the adverse inference he had granted in response to plaintiffs' spoliation motion concerning the Slack ESI. The arbitrator further determined plaintiffs were not entitled to relief because they had unclean hands, having pledged to Flushing Bank all their contract rights, including their rights to pursue claims from defendants for alleged monies misappropriated for the pre-closing accounts receivable, but then pursuing those claims in the litigation even though they had been pledged to Flushing Bank. The arbitrator also reasoned that plaintiffs' claims were dependent on proving defendants had wrongfully diverted accounts receivable

26

due Broadway, but plaintiffs had not presented sufficient evidence establishing that had occurred. The arbitrator also dismissed one cause of action in defendants' counterclaim because he did not find credible Simond's testimony concerning the damages sought on that claim.

The arbitrator also determined defendants were due substantial sums—in excess of $1,200,000—under the promissory notes and for other obligations due under the SPA, but the arbitrator reasoned that a damages award against plaintiffs was not warranted because it was "incompatible in equity especially considering the issue of the 'missing server' that was [defendants'] responsibility." The arbitrator therefore determined defendants were not entitled to any damages on their counterclaims based on what he found "was spoliation on behalf of . . . defendants" and, as a further spoliation sanction, the arbitrator required that Tassev and Levine pay plaintiffs $219,598.05 for the costs plaintiffs had incurred with their computer-forensics expert, BIA.

Tassev, Weaver, and Ocean Coast moved in the Chancery Division to confirm the arbitration award. Plaintiffs cross-moved to challenge the arbitrator's decision "on the issue of spoliation," arguing the arbitrator had erred by denying plaintiffs' request for suppression of defendants' defenses and entry of default as the spoliation sanction. Levine opposed plaintiffs' cross-motion,

in part arguing the arbitration award barred plaintiffs' appeal from the arbitrator's decision on the spoliation motion, while the remaining defendants conceded that "[d]espite what appears to be [p]laintiffs' pursuit of a meritless appeal . . . confirmation of the [a]rbitration [a]ward does not alter [p]laintiffs' appellate rights with respect to the discrete issue of spoliation."

The court later issued August 26, 2021 orders confirming the arbitration award and denying plaintiffs' cross-motion challenging the arbitrator's decision denying their request for suppression of defendants' defenses and entry of default as the sanction for their spoliation of the 44 KM-Exchange 1 server and Slack ESI. In a written statement of reasons accompanying the orders, the court determined that the parties' arbitration agreement had expressly reserved plaintiffs' right to appeal to the Chancery Division, and our appellate courts, the arbitrator's determination of plaintiffs' motion for a spoliation sanction. Thus, the court concluded it had the authority to consider plaintiffs' challenge to the arbitrator's determination on the motion, which had been reserved by the arbitrator until the issuance of the arbitration award.

The court then reviewed the arbitrator's decision on the spoliation issue and concluded the arbitrator had not abused his discretion in denying defendants a damages award on their counterclaims, instead of suppression of defendants'

28

defenses and entry of default, as appropriate sanctions for the spoliation of the server and ESI. The court further noted that although plaintiffs had appealed the arbitrator's decision on the spoliation sanction, the arbitrator's "ultimate decision was based upon the failure of [p]laintiffs to sustain their burden of proof . . . ." Thus, the court confirmed the arbitration award, entered judgment in accordance with the award, and denied plaintiffs' cross motion. This appeal followed.

## II.

"Judicial review of an arbitration award is very limited." Bound Brook Bd. of Educ. v. Ciripompa, 228 N.J. 4, 11 (2017). In reviewing a motion to vacate or confirm an arbitration award, "we must be mindful of New Jersey's strong preference for judicial confirmation of arbitration awards." Sanjuan v. School Dist. of W. N.Y., 256 N.J. 369, 381 (2024) (quoting Middletown Twp. PBA Loc. 124 v. Twp. of Middletown, 193 N.J. 1, 10 (2007)). "To foster finality and 'secure arbitration's speedy and inexpensive nature,' reviewing courts must give arbitration awards 'considerable deference.'" Borough of Carteret v. Firefighters Mut. Benevolent Ass'n Loc. 67, 247 N.J. 202, 211 (2021) (quoting Borough of E. Rutherford v. E. Rutherford PBA Loc. 275, 213 N.J. 190, 201 (2013)).

Under the pertinent provisions of the NJAA, "a court will vacate an arbitration award only if:"

> (1) the award was procured by corruption, fraud, or other undue means;
>
> (2) the court finds evident partiality by an arbitrator; corruption by an arbitrator; or misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding;
>
> (3) an arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to consider evidence material to the controversy, or otherwise conducted the hearing contrary to [N.J.S.A. 2A:23B-15], so as to substantially prejudice the rights of a party to the arbitration proceeding;
>
> (4) an arbitrator exceeded the arbitrator's powers;
>
> (5) there was no agreement to arbitrate, unless the person participated in the arbitration proceeding without raising the objection pursuant to subsection c. of [N.J.S.A. 2A:23B-15] not later than the beginning of the arbitration hearing; or
>
> (6) the arbitration was conducted without proper notice of the initiation of an arbitration as required in section 9 of this act so as to substantially prejudice the rights of a party to the arbitration proceeding.
>
> [Fawzy v. Fawzy, 199 N.J. 456, 470 (2009) (quoting N.J.S.A. 2A:23B-23(a)(1) to (6)).]

Here, plaintiffs do not argue that they are entitled to vacatur of the arbitration award on any of the grounds set forth in N.J.S.A. 2A:23B-23. And

30

we find no evidence in the record that otherwise supports vacatur of any aspect of the award under the four statutory criteria. See N.J.S.A. 2A:23B-23(a) to (6).

Plaintiffs' arguments on appeal are limited to a challenge to only the arbitrator's and court's determination on their motion for a sanction based on defendants' spoliation of ESI evidence. The court found, and we agree, that the parties' arbitration agreement preserved their right to appeal from the arbitrator's decision on plaintiffs' spoliation motion. We reject Levine's claim that the clearly preserved right to appeal from the arbitrator's decision on plaintiffs' spoliation motion to the Chancery Division is limited only to appeals challenging the arbitrator's disposition of plaintiffs' spoliation motions that were made during the pendency of the arbitration proceeding such that a challenge in court to the arbitrator's decision on a spoliation motion could not be filed following issuance of the final arbitration award.

No language in the arbitration agreement directly imposes such a limitation. Although it permitted an appeal to the Chancery Division from a ruling on the spoliation-sanction motion during the pendency of the arbitration, the agreement does not prohibit a party from challenging in court the arbitrator's disposition of plaintiffs' spoliation motion where, as here, the arbitrator reserved

decision on the motion and did not decide it until issuance of the final arbitration award.

"[I]t is not the function of the court to make a better contract for the parties, or to supply terms that have not been agreed upon," Graziano v. Grant, 326 N.J. Super. 328, 342 (App. Div. 1999), and we will not do so here to impose a limitation on plaintiffs' right to challenge in the Chancery Division the arbitrator's determination of plaintiffs' spoliation motion that is otherwise absent from the arbitration agreement. And, in fact, in its June 7, 2019 order dismissing the court case in favor of the parties' agreement to arbitrate, the court expressly retained jurisdiction to review the arbitrator's decision on any renewed spoliation-sanction motion that might be filed by plaintiffs. Therefore, plaintiffs properly sought review in the Chancery Division of the arbitrator's denial of their request for a sanction suppressing defendants' defenses and entering default.

The arbitration agreement also provides that a parties' challenge to the arbitrator's disposition of plaintiffs' spoliation motion must follow the procedures set forth in the court's May 30, 2018 order. That order directed that decisions by the arbitrator, who at the time the order had been entered was serving as a special master, shall be considered by the Chancery Division in

32

accordance with Rules 4:41-1 to -5. At the times relevant to this case, those Rules governed the appointment of a special master and the court's consideration of a report from a special master.[5] In their arbitration agreement, the parties agreed those Rules would apply to the arbitrator's determination of plaintiffs' spoliation motion. And, as we have explained, the court reviewed the arbitrator's determination of the spoliation motion, noted the legal principles applicable to determining an appropriate sanction for spoliation of evidence, found the arbitrator had "carefully evaluated the facts and circumstances of the case in order that the true impact of the spoliated items could be assessed" and "considered the competing claims of the parties," and concluded "the proper remedy was to dismiss [d]efendants' counterclaims and not strike their [a]nswer and [d]efenses."

Plaintiffs do not make any showing the arbitrator's disposition of the spoliation motion should have been vacated by the court under the statutory criteria set forth in N.J.S.A. 2A:23B-23. Thus, to the extent plaintiffs' challenge to the arbitrator's disposition of the spoliation motion might be deemed a claim

---

[5] "By order dated April 5, 2024, the term 'Special Master'" in the Rules was replaced by "Special Adjudicator. A [c]onforming rule amendment effective May 2024 followed." Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 4:41-1 to -5 (2025).

that the court erred by failing to vacate that portion of the arbitration award, we affirm the court's order. See Ciripompa, 228 N.J. at 11 ("An arbitrator's award is not to cast aside lightly. It is subject to being vacated only when it is has been shown that a statutory basis justifies that action." (quoting Kearny PBA Loc. #21 v. Town of Kearny, 81 N.J. 208, 221 (1979))).

We cannot ignore, however, that in its May 30, 2018 order, the retained jurisdiction over any issues to be decided by the then-special master, and the parties' arbitration agreement expressly provided that the arbitrator's disposition of plaintiffs' spoliation motion remained subject to the court's jurisdiction upon the filing of "an appeal with the Superior Court." Because the parties consented to the continuing jurisdiction over plaintiffs' spoliation motion—by allowing the arbitrator to first consider and decide the motion subject to review by the court in accordance with Rules 4:41-1 to -5—we consider the validity of the court's, not the arbitrator's, decision on the motion. In doing so, we are guided by the principle that discovery sanctions are reviewed under an abuse-of-discretion standard and "will not be disturbed on appeal if they are just and reasonable under the circumstances." Aetna Life & Cas. Co. v. Imet Mason Contractors, 309 N.J. Super. 358, 365 (App. Div. 1998).

"A duty to preserve evidence 'arises when there is pending or likely litigation between the two parties, knowledge of this fact by the alleged spoliating party, evidence relevant to the litigation, and foreseeability that the opposing party would be prejudiced by the destruction or disposal of this evidence.'" Bldg. Materials Corp. of Am. v. Allstate Ins. Co., 424 N.J. Super. 448, 471-72 (App. Div. 2012) (quoting Cockerline v. Menendez, 411 N.J. Super. 596, 620 (App. Div. 2010)).[6] Spoliation is "the hiding or destroying of litigation evidence, generally by an adverse party." Rosenblit v. Zimmerman, 166 N.J. 391, 401 (2001).

"Although spoliation most often arises in the context of destroyed evidence, it is equally applicable to situations where evidence has been concealed or materially altered." Bldg. Materials Corp., 424 N.J. Super. at 474. "The key in any situation is the effect the spoliator's actions had on the aggrieved party's ability to present its case." Ibid. In other words, the non-spoliating party must demonstrate that the spoliated evidence was "necessary to [the] party's cause of action." Rosenblit, 166 N.J. at 411.

---

[6]  Neither Tassev nor Levine dispute that they had a duty to preserve ESI evidence, including the 4 KM-Exchange 1 server, relevant to this litigation.

The choice of remedy for spoliation is left to the sound discretion of the court, upon consideration of several factors. Robertet Flavors, Inc. v. Tri-Form Constr., Inc., 203 N.J. 252, 284 (2010). They include the spoliator's identity and degree of fault; the timing of the spoliation's discovery; the resultant prejudice; and the availability of lesser sanctions that will serve to "avoid unfairness to the non-spoliator," "make [the non-spoliator] whole, as nearly as possible," "punish the wrongdoer," and "deter others from such conduct." Lanzo v. Cyprus Amax Minerals Co., 467 N.J. Super. 476, 526 (App. Div.), certif. denied, 248 N.J. 247 (2021) (quoting Robertet Flavors, 203 N.J. at 272-73, 278).

A common spoliation remedy is an adverse inference, which "allows the [fact-finder] in the underlying case to presume that the evidence the spoliator destroyed or otherwise concealed would have been unfavorable to him or her." Rosenblit, 166 N.J. at 401-02. Another "is the discovery sanction" under Rule 4:23-4, which permits a court to impose various sanctions based on a party's failure to comply with a discovery obligation, including "order[ing] that designated facts be taken as established, refuse to permit the disobedient party to support or oppose designated claims or defenses, prohibit the introduction of designated matters into evidence, dismiss an action, or enter judgment by default." Id. at 402-03.

Our Supreme Court has explained that a sanction like dismissal of a cause of action is a "harsh and draconian remedy" for spoliation and is to be imposed "only sparingly" and "will normally be ordered only when no lesser sanction will suffice to erase the prejudice suffered by the non-delinquent party." Robertet Flavors, 203 N.J. at 274; see also Aetna, 309 N.J. Super. at 369 ("[T]he ultimate sanction of dismissal should be a remedy of last resort."). The intent of the spoliator "does not affect the spoliator's liability . . . because the focus is on erasing the prejudice suffered by the opposing party." Lanzo, 467 N.J. Super. at 527.

Measured against these principles, we discern no abuse of discretion in either the arbitrator's or the court's denial of plaintiffs' request for the draconian and severe spoliation sanction of suppression of all defendants' defenses and entry of a default against them. Indeed, the arbitrator in the first instance, and the court in the second, imposed a severe spoliation sanction—dismissal of all defendants' counterclaims after finding defendants were otherwise entitled to more than $1,200,000 on those counterclaims and the requirement that Tassev and Levine pay plaintiffs $219,598.05 for the costs plaintiffs had incurred with their computer-forensics expert.

37

That the significant sanctions imposed by the arbitrator and the court are not as severe as the suppression and default sanction sought by plaintiffs does not render the court's determination an abuse of discretion. Although there is no dispute Tassev failed to produce the primary 44 KM-Exchange 1 server, the evidence otherwise showed that the servers that were produced yielded over 130,000 emails, and plaintiffs otherwise failed to present proof convincing to the arbitrator and the court that the missing server contained evidence "necessary to [their] cause of action," Rosenblit, 166 N.J. 411, thereby negatively affecting their ability to present their case, Bldg. Materials Corp., 424 N.J. Super. at 474.

Indeed, the evidence presented during the arbitration focused on plaintiffs' claim Tassev and Levine had improperly accessed plaintiffs' accounts and diverted pre-closing accounts receivables to themselves. Plaintiffs primarily relied on the testimony of their forensic accountant, O'Donnell, Broadway's financial records, the SPA, and other witness testimony to support the claim, but the arbitrator found the evidence unpersuasive for the reasons detailed in the arbitration award, accepted the testimony of defendants' forensic accountant, Simonds, as more persuasive, and plaintiffs make no showing that any information—emails—that might have been on the missing server would have

A-0356-21

strengthened their claims. In sum, plaintiffs do not demonstrate how the purported missing emails impacted their ability to prove their causes of action, the merits of which hinged upon the forensic accountants' expert testimony and the arbitrator's assessment of their credibility, such that we could properly conclude that the court's rejection of plaintiffs' request for a suppression-and-default sanction, instead of the significant dismissal of counterclaims for which defendants would have been entitled to more than $1,200,000 and requirement that defendants reimburse plaintiffs for $219,598.05 for their computer-forensics expert costs, constitutes an abuse of discretion.

The arbitrator made findings supporting the spoliation sanction that he recommended and the court adopted noting, for example, that Tassev was at fault, more so than Levine, for the missing server, and that severe prejudice would befall plaintiffs if they were required to pay Tassev and Levine the balances due on the two $400,000 promissory notes, given plaintiffs' own significant losses, which the arbitrator found were not attributable to Tassev and Levine. Thus, the sanction imposed, although less severe than the one sought by plaintiffs, avoided unfairness to either side, was sufficient to deter future acts of spoliation, and punished Tassev and Levine in that they failed to recover more than $1,200,000 otherwise owed to them under the SPA and were required to

pay plaintiffs an additional $219,598.05 for the costs of the computer-forensics expert. In sum, the arbitrator and separately the court, through its review and adoption of the arbitrator's decision, did not abuse its discretion in denying plaintiffs' request for a suppression-and-default sanction and by imposing an appropriate and significant alternative sanction.

To the extent we have not otherwise expressly addressed any of plaintiffs' remaining arguments, including their contention the court erred by denying their motion for attorney's fees, we find they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-2(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0356-21